**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2970

———————

IN RE:  AETNA, INC. SECURITIES LITIGATION


VARMA MUTUAL PENSION INSURANCE COMPANY,
Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-07-cv-04451)
District Judge:  Hon. Thomas N. O'Neill

———————

Argued on February 11, 2010

Before:  SLOVITER, ROTH, and TASHIMA*, <u>Circuit Judges</u>

(Opinion filed: August 11, 2010)

———————

*Honorable A. Wallace Tashima, Senior United States
Circuit Judge for the Ninth Circuit, sitting by designation.

Michael K. Yarnoff, Esquire **(Argued)**
Benjamin J. Sweet, Esquire
Bharati O. Sharma, Esquire
Barroway, Topaz, Kessler, Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA   19087

Jay W. Eisenhofer, Esquire
Charles T. Caliendo, Esquire
Grant & Eisenhofer, P. A.
485 Lexington Avenue
New York, NY   10017

James R. Banko, Esquire
Geoffrey C. Jarvis, Esquire
Grant & Eisenhofer, P. A.
Chase Manhattan Centre
1201 North Market Street
Suite 2100
Wilmington, DE   19801

*Counsel for Appellant*

Michael P. Carroll, Esquire **(Argued)**
Michael S. Flynn, Esquire
Jonathan D. Martin, Esquire
Davis, Polk & Wardwell, LLP
450 Lexington Avenue
New York, NY   10017

2

John M. Elliott, Esquire
Frederick P. Santarelli, Esquire
Elliott, Greenleaf & Siedzikowski, P. C.
945 Harvest Drive, Suite 300
Blue Bell, PA 19422

*Counsel for Appellees*

---

O P I N I O N

---

**ROTH**, Circuit Judge:

Plaintiff shareholders appeal the District Court's order dismissing this securities fraud class action under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5(c)(1), which contains a safe harbor for forward-looking statements. We find the alleged misrepresentations which form the basis of plaintiffs' claims are protected by the safe harbor because they are forward-looking and immaterial as a matter of law. We will therefore affirm the order of the District Court.

## I. **Factual and Procedural Background**

Lead plaintiff Varma Mutual Pension Insurance Company seeks to represent a class of investors who purchased securities of Aetna, Inc., between October 27, 2005, and July 27, 2006. The Consolidated Class Action Complaint names as defendants Aetna and four of its officers employed at the time

of the alleged fraud: John Rowe, Ronald Williams, Alan Bennett, and Craig Callen.[1] Aetna, a Pennsylvania corporation with operations in multiple states, provides medical insurance and health care benefits to more than 14 million customers.

The complaint alleges a fraudulent scheme wherein defendants misled investors about Aetna's pricing of insurance policies and then sold shares of Aetna's stock before the scheme was revealed to the public. In particular, plaintiffs claim that defendants falsely characterized Aetna's pricing of medical insurance premiums as "disciplined," which, plaintiffs claim, refers to a conservative underwriting practice of setting premiums in a fixed proportion to expected future medical costs. Within the health care industry, this proportion is known as the

---

[1] Williams is Chairman and CEO of Aetna; he previously served as President from May 2002 to July 2007. Rowe was CEO from February 2000 to February 2006 and Chairman from April 2001 to October 2006. Bennett was CFO from September 2001 to April 2007. Callen was Senior Vice President and Head of Strategic Planning and Business Development from April 2004 to November 2007.

4

"medical cost ratio" (MCR).[2] According to plaintiffs, investors rely on MCR as an indicator of profitability.

Plaintiffs claim the fraud began in September 2005, when Aetna allegedly relaxed its underwriting criteria in an effort to underprice competitors and gain market share. Plaintiffs claim that defendants knew this would adversely affect Aetna's MCR and stock price so that defendants concealed the relaxed underwriting criteria by publicly touting a "disciplined" pricing policy. In February 2006, Rowe, Bennett and Callen sold substantial holdings of Aetna stock on the open market at prices that plaintiffs claim were artificially inflated by the fraud.[3] In April and July 2006, Aetna reported two consecutive quarterly increases in MCR, which plaintiffs attribute to Aetna's supposedly secret policy of underpricing premiums.

---

[2]Plaintiffs describe the MCR as "a ratio of the dollars a company spends on medical costs, physician reimbursement and other claims-related services (collectively referred to as medical costs) expressed as a percentage of premiums charged to the insured for such services. In other words, the ratio is medical costs divided by premiums."

[3]According to the complaint, "Rowe, Bennett and Callen all had set up 10b5-1 trading plans from early October to mid-November 2005." Rowe sold 887,000 shares (proceeds of $42.89 million), Bennett sold 280,000 shares (proceeds of $14.18 million), and Callen sold 60,000 shares (proceeds of $3.04 million). Williams did not sell any shares.

During the class period, the price of Aetna's stock fell from $52.48 to $33.25. The loss of shareholder equity occurred when the alleged underpricing was revealed by Aetna's reporting of quarterly MCR data. Plaintiffs claim that defendants' statements about "disciplined" pricing artificially inflated Aetna's stock by leading investors to believe that MCR would be lower and that profitability would be higher.

To corroborate their allegations, Plaintiffs cite contemporaneous reports by financial analysts and journalists who speculated that Aetna was boosting its market share by underpricing premiums. Plaintiffs also proffer confidential witness statements by Aetna employees who claim to have implemented the relaxed underwriting criteria. Other confidential witnesses stated that they personally observed the individual defendants' hands-on managerial style, from which plaintiffs impute actual knowledge that Aetna was underpricing premiums.

## A. Defendants' Statements

The complaint identifies numerous statements which allegedly misled investors; all statements pertain to Aetna's "disciplined" pricing of medical insurance premiums. We summarize the relevant statements below.

On October 27, 2005, Rowe stated on an analyst conference call, "Regarding pricing, we continue to adhere to a disciplined pricing policy of achieving premium yields that are in line with medical cost trends." During the same call, Williams stated, "[W]e are pricing very clearly in line with our

6

medical cost trend . . . . [W]e have a very strong amount of pricing discipline . . . . What we are doing is making certain that we are pricing appropriately as best we can, to be certain that we're meeting our shareholder expectations."

On February 9, 2006, Rowe and Williams participated in another analyst conference call; plaintiffs claim that "Rowe continued to stress Aetna's 'disciplined approach to pricing' while Williams emphasized Aetna's commitment to 'profitably grow market share and earnings' through 'disciplined pricing' and noted that '[o]ur pricing discipline is unchanged.'" Plaintiffs claim that Rowe and Williams misled investors by publicly touting a "disciplined" pricing policy while secretly underpricing premiums to boost market share.

Plaintiffs claim that in April 2006, when Aetna reported financial results for the first quarter, it concealed the alleged underpricing by falsely attributing an increase in MCR to higher medical expenses:

> This increase in the medical cost ratio for the first quarter of 2006 reflects a percentage increase in per member medical costs that outpaced the percentage increase in per member premiums, due to higher medical cost trends for inpatient and outpatient facility and physician services offset by a moderation in medical cost trend for ancillary and pharmacy services.

Aetna Form 10-Q (Apr. 27, 2006). Plaintiffs claim that this disclosure was misleading because the increase in MCR was

7

caused by the underpricing of premiums, not by higher medical expenses.

On April 27, 2006, Williams discussed Aetna's first quarter results on an analyst conference call and stated, "[W]e continue to adhere to our pricing discipline." On the same call, Bennett stated, "[W]e expect a quarterly pattern to reflect a slightly higher MCR in the second quarter compared to the first-quarter level." Plaintiffs claim that Williams' statement was false because Aetna's pricing was not disciplined and that Bennett's statement was misleading because he knew underpricing would cause the second quarter MCR to increase substantially, not slightly. On April 28, 2006, Aetna's stock price fell by more than 20%, causing a market capitalization loss of $5.4 billion.

On May 1, 2006, Williams discussed Aetna's first quarter MCR performance on an analyst conference call and stated:

> In addition, some have questioned our membership growth and said that we must be pricing aggressively . . . .
> Of the 82,000 total fully insured additions, 15,000 are Medicaid Advantage, 4,000 were in student health, 14,000 in SRC and 23,000 in individual. That leaves growth of 26,000 members from our main customer markets of national, middle and small group. **This is solid and balanced growth that is representative of our dedication to pricing**, as well as the broad diversification of markets we are actively pursuing.

8

> **I will end my comments by reaffirming to you my personal commitment to continue to maintain discipline and rigor in everything we do at Aetna.**

(Compl. ¶ 89, A101 (emphasis and alteration in complaint).)

On May 16, 2006, Williams spoke at a health care conference and stated:

> **We also continue as a priority to exhibit commitment to discipline pricing.** I think it is important to understand that the management incentives and discipline that we have are aligned to profit increases. We operate a set of fully allocated profit and loss P&Ls throughout the Company where general managers are incented to achieve a discipline level designed to help maximize those margins and not simply to support membership growth. **Given a decision, we will always take profitability over growth.**

(Compl. ¶ 91, A102 (emphasis in complaint).) Plaintiffs claim these statements were false and misleading because Williams knew Aetna was underpricing premiums and sacrificing profitability for growth.

On July 27, 2006, Aetna announced financial results for the second fiscal quarter, including a 2% quarterly increase in MCR. Plaintiffs claim that, contrary to Bennett's April 27, 2006 prediction of "a slightly higher MCR in the second quarter," the

9

actual increase of 2% was substantial.  That same day, Aetna's stock price fell by 17%, causing a market capitalization loss of $3.58 billion.

Based on these occurrences, the plaintiffs filed a complaint asserting three causes of action under the Securities Exchange Act of 1934:  Count I alleges violations of Exchange Act Section 10(b), Count II alleges violations of Exchange Act Section 20(a), and Count III alleges violations of Exchange Act Section 18.

### B.  District Court's Dismissal

Defendants filed a motion to dismiss the complaint, which the District Court granted with prejudice.  In its thorough and well-crafted opinion, the District Court held that all statements which form the basis of Count I were forward-looking and therefore protected by the statutory safe harbor, 15 U.S.C. § 78u-5(c)(1).  The court dismissed Count II as derivative of Count I, and held that Count III was barred by the statute of limitations.  Plaintiffs only appeal the dismissal of Counts I and II.

## II.  Discussion

### A.  Standard of Review and Jurisdiction

We review the District Court's decision *de novo*, accepting as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom as viewed most favorably to the non-moving party.  *DeBenedictis v.*

*Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007). The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

## B. Securities Exchange Act of 1934 Section 10(b)

The Securities Exchange Act of 1934 Section 10(b), and regulations promulgated thereunder, prohibit fraud in connection with the sale or purchase of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).[4] Parties injured by securities fraud may bring a private cause of action under Section 10(b), which requires proof of six elements: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection

---

[4] "Section 10(b) of the Securities Exchange Act forbids (1) the 'use or employ[ment of] . . . any manipulative or deceptive device or contrivance,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of [SEC] rules and regulations.' 15 U.S.C. § 78j(b) (2006). SEC regulations, in turn, make it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading' in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b)." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).

between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). This appeal involves only the first element, whether defendants made a material misrepresentation or omission.

Federal securities fraud litigation is governed by the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737, which Congress enacted "[a]s a check against abusive litigation by private parties . . .." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA imposes two exacting and distinct pleading requirements for securities fraud actions. First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Under the PSLRA, alleged misrepresentations are not actionable if they fall within the safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c). The issue on appeal is whether defendants' statements were immunized by the safe harbor.

12

**1. PSLRA Safe Harbor for Forward-Looking Statements**

The PSLRA's safe harbor for forward-looking statements provides in relevant part:

(1) [I]n any private action . . . based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that–

(A) the forward-looking statement is–

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actua results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement–

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity;[,] was--

13

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements. In the case of an oral forward-looking statement . . ., the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied–

(A) if the oral forward-looking statement is accompanied by a cautionary statement–

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if–

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

14

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(1)-(2).

Thus, the safe harbor applies to statements that are forward-looking as defined by the statute provided that they are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading.

### a. Statutory Definition of "Forward-Looking Statement"

Our threshold inquiry is whether defendants' statements fall within the broad statutory definition of 'forward-looking statement,' which includes, *inter alia*, projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance. 15 U.S.C. § 78u-5(i)(1).[5]

---

[5] The PSLRA defines "forward-looking statement" as:

(A) a statement containing a projection of revenues, income

15

We recently construed the statutory definition in *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009). There, shareholders alleged a fraudulent scheme wherein executives of Avaya, a telecommunications company, denied the company "was offering unusual price discounts and that its

---

(including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

16

profit margins were being impaired," and then publicized falsely-optimistic financial projections that could not be achieved because of the price discounting's negative effect on profitability. *Id.* at 249. The shareholders filed suit under Section 10(b) and alleged two types of misleading statements:

> First, there are "pricing pressure statements," in which [defendants] are alleged to have falsely denied Avaya was offering unusual discounts and facing significant pricing pressure from market rivals. Second, there are "forecast-related statements," in which defendants projected financial results (such as operating margin and revenue growth) and made positive portrayals, notably the statement that Avaya was "on track" to achieve its goals or projections.

*Avaya, Inc.*, 564 F.3d at 246.

The "pricing pressure" statements were made by Avaya's chief financial officer, who denied that deteriorating demand adversely affected the market price for the company's products.[6] The "forecast-related" statements contained forward-looking projections, but described those projections in present-tense language. For example, defendants stated, "Our first quarter results position us to meet our goals for the year . . . . [W]e are

---

[6]Although not an issue considered on this appeal, the safe harbor did not apply to those statements because they clearly referred to historical rather than future performance.

on track to meet our goals for the year, even though there were some aspects to our performance that are below our expectations and that we are working on to improve." *Id.* at 254. We concluded that such a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* at 255. However, when read in context, the present-tense statements (*i.e.*, "we are on track" and "first quarter results position us") could not "meaningfully be distinguished from the future projection of which they are a part" (*i.e.*, Avaya's future goals). *Id.* To the extent that those statements contained assertions about the present, we found "the assertions of current fact are too vague to be actionable." *Id.*

As we noted in *Avaya*, it was distinguishable from cases in which the allegedly misleading statements contained separately discernable references to the present. *Id.* For example, in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, the statement that sales were "still going strong" was not forward-looking because it "would be misleading if [defendant] knew that its sales were about to collapse." 513 F.3d 702, 705 (7th Cir. 2008). In *In re Stone & Webster, Inc., Securities Litigation*, the statement that the defendant "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs" was not forward-looking because "[t]he part of the statement that speaks of the quantity of cash on hand speaks of a present fact." 414 F.3d 187, 207, 212 (1st Cir. 2005).

In the case before us, the allegedly misleading representations consist of vague and generalized statements

18

about "disciplined" pricing.[7]  The District Court properly began its analysis by ascertaining what factual assertions were conveyed by those statements.  According to the court, the parties had agreed that "disciplined" pricing referred to Aetna's expectation of "achieving premium yields that are in line with [Aetna's] medical cost trend."  Based on this understanding of the term "disciplined" pricing, the court concluded that the statements were forward-looking because they expressed expectations about Aetna's medical cost trend, "a specific measure of future performance."  So construed the representations were within the safe harbor's definition of "forward-looking statement."  *See* 15 U.S.C. § 78u-5(i)(1)(B) ("statement of the plans and objectives of management for future operations") and (C) ("statement of future economic performance").  Applying *Avaya*, the court found that, while certain elements of defendants' statements were partly historical

---

[7] Specifically, plaintiffs allege the following statements are misleading: (1) "We have, we believe, very strong pricing discipline;" (2) "we continue to adhere to a disciplined pricing policy of achieving premium yields that are in line with medical cost trends;" (3) "this pricing discipline has contributed to the stability we have realized in our . . . MCR;" (4) "[o]ur pricing policy remains consistent;" (5) "we continue to exercise pricing discipline;" (6) "our pricing discipline is unchanged;" (7) membership growth "is solid and balanced growth that is representative of our dedication to disciplined pricing;" (8) "we also continue as a priority to exhibit commitment to discipline[d] pricing;" and (9) Aetna remains "committed to pricing discipline [as it has over] the past five years."

19

and partly present-tense (i.e., statements such as "remains consistent," "is unchanged," and "we continue to adhere to"), those elements could not be distinguished from the statements' assertions about the future.

On appeal, plaintiffs argue that the District Court misunderstood what defendants meant by the term "disciplined" pricing. Plaintiffs contend that, by "engaging in 'disciplined' pricing, Aetna is telling investors that, based upon what the Company currently estimates costs to be for the policies it is writing, these policies will be profitable." Plaintiffs argue that, although the statements contain projections about future profitability, they also convey information about current pricing which is necessarily based on historic data. Plaintiffs also assert that the District Court overlooked the allegedly misleading statement in Aetna's first quarter 2006 Form 10-Q, which contained an allegedly false, past-tense explanation for the increase in MCR.

Defendants contend that plaintiffs' characterization is wrong because Aetna explicitly defined "disciplined" pricing as a policy of "achieving premium yields that are in line with [its] medical cost trend." They argue that the "disciplined" pricing statements are "classic forward-looking statements" because "whether Aetna succeeds in 'achieving premium yields in line with our medical cost trend' cannot be confirmed until future results – in particular, actual medical costs incurred on policies – are known." Defendants assert that the statements are not actionable because they are vague projections of future profitability. Regarding the allegedly misleading Form 10-Q disclosure, defendants argue that the 10-Q explicitly stated the

20

fact that plaintiffs claim was fraudulently concealed , *i.e.*, that for some insurance policies, medical costs "outpaced the percentage increase in per member premiums" – in other words that Aetna underpriced some of its policies.[8]

Our examination begins with a determination of which aspect of the statements are false. *See In re Stone & Webster, Inc.*, 414 F.3d at 213. Plaintiffs claim that defendants misrepresented Aetna's underwriting practices during the class period by referring to its pricing as "disciplined." However, whether Aetna's pricing was, in fact, disciplined could not have been determined at the time defendants made the statements. The term "disciplined" pricing describes a policy of setting prices in relation to future medical costs. At the time the statements were made, the medical costs had not yet been incurred and could not be ascertained until later.

---

[8] The relevant language in the Form 10-Q is as follows:

This increase in the medical cost ratio for the first quarter of 2006 reflects a percentage increase in per member medical costs that outpaced the percentage increase in per member premiums, due to higher medical cost trends for inpatient and outpatient facility and physician services offset by a moderation in medical cost trend for ancillary and pharmacy services.

Aetna Form 10-Q (Apr. 27, 2006).

Thus, to the extent that "disciplined" pricing said anything about the current price of premiums, it did so in the form of a projection. This is evident from plaintiffs' own understanding of the term. As noted above, plaintiffs contend that by "engaging in 'disciplined' pricing, Aetna is telling investors that, based upon what the Company currently estimates costs to be for the policies it is writing, these policies will be profitable." Statements about future profitability and assumptions underlying management's expectations about the future fall squarely within the definition of forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(A) and (D).

Plaintiffs further claim that Aetna's April 27 Form 10-Q disclosure was misleading because it falsely attributed the first quarter increase in MCR to higher medical costs without revealing the underpricing of premiums. While we agree that the safe harbor does not apply to this statement because it is historical rather than forward-looking, we find the statement itself contains no falsity. Even accepting plaintiffs' allegations about underpricing as true, the statement asserts the very fact allegedly concealed, that the increase in medical costs exceeded the increase in premium revenue. Aetna need not adopt plaintiffs' characterization of "underpricing" in its financial statements to avoid liability for securities fraud.[9]

---

[9] Aetna also reported financial data about its premium revenues, which plaintiffs do not allege to be inaccurate. Aetna's Form 10-Q reported total quarterly revenue from premiums as compared to prior periods and a "News Release" dated April 27, 2006, reported the number of insureds under

22

For these reasons, we hold that the allegedly misleading assertions regarding Aetna's "disciplined" pricing policy fall within the safe harbor's definition of forward-looking statement.[10]

_____

contract as compared to prior periods. These disclosures further undermine plaintiffs' theory of falsity. *See In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").

[10]The written forward-looking statements were identified as such in Aetna's written press releases and Form 10-Ks. The oral forward-looking statements were identified as such in contemporaneous oral statements that referred listeners to written cautionary language in Aetna's Form 10-Ks.

Plaintiffs, however, argue that two statements were not identified as forward-looking and are thus ineligible for protection under the safe harbor. Plaintiffs concede that the statements were accompanied by cautionary language but argue that "nothing in the record" shows exactly how the statements were identified as forward-looking. Because plaintiffs did not present this argument to the District Court, the record on this issue was not properly developed for appellate review. The alleged insufficiency of statements not contained in the record provides no basis for remand.

### b. Meaningful Cautionary Statements

The safe harbor provides that forward-looking statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). This aspect of the safe harbor is analogous to the "bespeaks caution" doctrine, which holds that "cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000). Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004). Cautionary statements disclosed in SEC filings may be incorporated by reference; they "do not have to be in the same document as the forward-looking statements." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005).

Plaintiffs argue that the cautionary language, which Aetna provided in financial reports filed with the SEC, was insufficient because it failed to disclose the alleged practice of underpricing premiums, and only addressed risks related to medical cost projections. The cautionary statements included the following language:

> Our ability to forecast and manage health care costs and implement increases in premium rates affects our profitability. Our profitability depends in large part on accurately forecasting health care costs and on our ability to appropriately manage

24

future health care costs through underwriting criteria . . ..

* * *

Our ability to forecast health care and other benefit costs, detect changes in these costs, and achieve appropriate pricing affects our profitability. We continue to be vigilant in our pricing and have increased our premiums for new and renewal business in 2006. Premiums in the health business are generally fixed for one-year periods. Accordingly, future cost increases in excess of medical cost projections reflected in pricing cannot be recovered in the contract year through higher premiums. As a result, the Company's results are particularly sensitive to the price increases it projects in advance of renewal of the business. There can be no assurance regarding the accuracy of medical cost projections assumed for pricing purposes, and if the rate of increase in medical costs in 2006 were to exceed the levels projected for pricing purposes, our results would be materially adversely affected.

This language provides clear warning to investors that the accuracy of medical costs cannot be assured, actual medical costs may exceed projections assumed for purposes of setting premiums, medical costs in excess of projections cannot be recovered through higher premiums, and inaccurate medical cost projections can have a materially negative effect on profitability. We find this language adequate under 15 U.S.C. §

25

78u-5(c)(1)(A)(i) because it provided meaningful, extensive, and specific caution directly related to the statements concerning "disciplined" pricing.

### c. Materiality

The safe harbor applies to forward-looking statements that are not material. 15 U.S.C. § 78u-5(c)(1)(A)(ii). A statement or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). *See Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) ("expressly adopt[ing] the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context"). A material misrepresentation or omission is actionable if it "significantly altered the 'total mix' of information made available.'" *Basic*, at 231-32 (quoting *TSC Industries*, 426 U.S. at 449).

"Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism . . .." *EP Medsystems, Inc.*, 235 F.3d at 872. Such statements "'constitute no more than 'puffery' and are understood by reasonable investors as such.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997)). A representation is immaterial if the "statement at issue is too vague to be actionable." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1428 (statement "that the company 'believed [it could] continue to grow net earnings at a faster rate than

sales'" was too vague).  "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Id.* at 1426.

In *In re Advanta Corp. Securities Litigation*, shareholders alleged a theory of fraud similar to the one alleged here regarding Aetna's "disciplined" pricing policy.  There, shareholders claimed that Advanta, a credit card company, publicly touted its strong financial health and "risk-adjusted pricing strategy," which targeted customers with good credit. 180 F.3d 525, 537.  In its annual report, Advanta stated, "While we added substantially to our account base, our credit quality remained excellent.  Our emphasis on gold cards – and targeting of better quality customers – helps us maintain an enviable credit quality profile."  *Id.*  Shareholders alleged that, contrary to those representations, Advanta had secretly relaxed its "underwriting and monitoring procedures" by offering introductory "teaser" rates to new customers with poor credit. *Id.*  Advanta's positive portrayals ultimately proved wrong when the new customers defaulted, causing a $20 million quarterly loss.  *Id.* at 528.  We held that Advanta's positive portrayals were vague, and "even if arguably misleading, do not give rise to a federal securities claim because they are not material . . .." *Id.* at 538.  We expressed doubt that "reasonable investors would make investment decisions based on the positive portrayals."  *Id.* at 539.

27

Here, the District Court applied *Advanta* and found defendants' statements about "disciplined" pricing "to be immaterial and not actionable because they are puffery, vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied." On appeal, plaintiffs contend that the "disciplined" pricing statements are not vague because they related specific information about Aetna's current pricing policy and falsely implied that MCR would remain stable. Plaintiffs argue that defendants' statements about "disciplined" pricing "are far more concrete than the vague and general adjectives in *Advanta*."

We disagree. The statements identified by plaintiffs contain oblique references to Aetna's pricing policy; such references are too vague to ascertain anything on which a reasonable investor might rely. For example, plaintiffs claim Williams "misled investors regarding Aetna's underpricing and its effect on higher first quarter MCR" by stating the following on a May 1, 2006 conference call with analysts:

> This is solid and balanced growth that is representative of our dedication to disciplined pricing . . . I will end my comments by reaffirming to you my personal commitment to continue to maintain discipline and rigor in everything we do at Aetna.

However, immediately before those remarks, Williams made other relevant statements about MCR and pricing which plaintiffs omit from the complaint:

28

> The customer markets, both geographical and by customer type, are very dynamic and vary greatly in terms of cost, premium levels, competitors and complexity. We talk in terms of aggregated consolidated results, but there are always markets or specific customers that are functioning better or worse than others or versus expectation.
>
> * * *
>
> [O]ur . . . book of business is constantly evolving and changing. As new business is written, cases get renewed and other cases lapse.

(A303.) These remarks, while broad and vague, at a minimum convey the complexity of Aetna's business, diversity of its customers, and variable nature of its portfolio of insurance contracts. They describe the difficulty of accurately predicting MCR and the heterogeneous nature of Aetna's products, services, customers, and pricing. When read in context, no reasonable investor could infer that "dedication to disciplined pricing," a vague and subjective statement, meant Aetna had applied (or failed to apply) a static, across-the-board formula to determine the price of premiums charged for all products and services. General statements about the company's dedication to "disciplined" pricing and commitment to "discipline and rigor" could not have meaningfully altered the total mix of information available to the investing public. We therefore find the statements immaterial as a matter of law.

29

We note that the state of the record renders our task of evaluating materiality a difficult one. Plaintiffs direct our attention to nine allegedly misleading statements made on analyst conference calls.[11] Quotations from those conference calls appear on the face of the complaint and form the basis of plaintiffs' claims. However, plaintiffs did not submit transcripts of those conference calls to the District Court, and the excerpted transcripts submitted by defendants omit seven of the nine statements we are called upon to review. The record only contains transcripts of Rowe's statement on October 27, 2005, and Williams' statement on May 1, 2006. This omission precludes our full consideration of the context in which the statements were made, an obvious impediment to our evaluation of materiality.[12]

---

[11]*See* footnote 7 *supra*.

[12] We have previously explained that:

As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.

The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint -- lack of notice to the plaintiff -- is dissipated where plaintiff has actual notice and has relied

### d. Actual Knowledge

The safe harbor applies to statements made without actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B). The District Court considered the allegations concerning defendants' state of mind and found the complaint failed to plead actual knowledge of the purported underpricing. Because we find defendants' statements too vague to contain an actionable falsity, we need not consider defendants' state of mind.

### C. Securities Exchange Act of 1934 Section 20(a)

The Securities Exchange Act of 1934 Section 20(a) imposes liability on controlling persons who aid and abet violations of the Act. 15 U.S.C. § 78t. Because we find there was no violation under Section 10(b), and no other violations are alleged, there is no controlling person liability under Section 20. *In re Merck & Co. Sec. Litig.*, 432 F.3d at 276. The District

---

upon these documents in framing the complaint. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (citations, quotation marks and alterations omitted).

Court, upon finding no liability under Section 10(b), properly dismissed the derivative claims under Section 20(a).

### III.  Conclusion

We hold that the PSLRA safe harbor for forward-looking statements immunizes defendants from liability for securities fraud.  The allegedly misleading statements were forward-looking, identified as such, accompanied by adequate cautionary statements, and immaterial as a matter of law.  We will therefore affirm the judgment of the District Court.